UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANN BRADFORD, et al., | Case No. 19-cv-04051-PJH |
| Plaintiffs, | |
| v. | **ORDER REMANDING ACTION** |
| CHEVRON USA INC., | Re: Dkt. Nos. 15 & 16 |
| Defendant. | |

Plaintiffs Joann Bradford, Liza Mosqueriola, Jason Rohrbach, and Brian White's motion to remand came on for hearing before this court on October 30, 2019. Defendant Chevron USA Inc.'s ("Chevron") motion to dismiss came on for hearing before this court on the same date. Plaintiffs appeared through their counsel, Alexander Nazarov. Defendant appeared through its counsel, Douglas Hart and Marina Gruber. Having read the papers filed by the parties and carefully considered their arguments and the relevant legal authority, and good cause appearing, the court hereby GRANTS plaintiffs' motion to remand and DENIES defendant's motion to dismiss, for the following reasons.

**BACKGROUND**

On June 7, 2019, plaintiffs commenced a putative class action against Chevron in the Superior Court of the State of California, County of Contra Costa. See Compl., Dkt. 1 at ECF p. 31. Plaintiffs' complaint alleges four causes of action: (1) failure to pay reporting-time pay pursuant to Industrial Welfare Commission Wage Order 1-2001, Cal. Code Regs. tit. 8, § 11010(5)(A) ("Wage Order 1-2001"); (2) failure to pay all wages earned at termination pursuant to Labor Code §§ 200–203; (3) failure to provide accurate

itemized wage statements pursuant to Labor Code §§ 226–226.3; and (4) violation of Business and Professions Code §§ 17200, et seq. All of plaintiffs' claims are based on their contention that Chevron failed to compensate certain employees for reporting-time relating to "standby shifts" and standby time. Compl. ¶¶1–5, 7, 22. As such, the parties agree that the second, third, and fourth causes of action are derivative of the first cause of action, in that those claims seek penalties and other relief for Chevron's alleged failure to pay wages disputed under the first cause of action. See Mot. at 2 ("The remaining claims are derivative from the reporting time pay claim."); Opp. at 9 (because the second, third, and fourth claims are derivate of the first, "preemption of Plaintiffs' claim for reporting time pay will result in preemption and ultimate dismissal of their remaining claims as well.").

On July 15, 2019, Chevron removed the action to this court. Dkt. 1. On August 14, 2019, plaintiffs filed the present motion to remand the action to state court. Dkt. 16. On August 21, 2019, defendant filed the present motion to dismiss the action. Dkt. 21.

Chevron owns and operates an oil refinery in Richmond, California. Plaintiffs are current and former operator employees (employees in that role are referred to as "Operators") who have worked at the Richmond refinery. The dispute centers around Chevron's policy of assigning Operators to "on-call" (also called "standby") shifts. (Operators are also assigned regular shifts, which are not challenged in this action.) Plaintiffs' essential contention is that Wage Order 1-2001 requires Chevron to pay Operators for shifts when they are required to be available and "on-call" to work, even when Chevron does not ultimately require the Operators to physically appear at its facility to work.

Between plaintiffs' allegations and defendant's submission of undisputed collective bargaining agreements, the relevant features of the Operators' standby shifts are not materially disputed, although there are minor discrepancies between the allegations and the collective bargaining agreements. See Leger Decl., Dkt. 1-1, Exs. A (2015–2019

Articles of Agreement), B (the "12-Hour Shift Agreement") (together, the "CBAs").[1]

Plaintiffs allege that Chevron requires Operators to work regular 12-hour shifts, scheduled in advance. Operators can generally be confident that they will be required to physically appear at Chevron's facility to work these shifts, and that they will be paid for their time. Chevron separately requires Operators to be available for 12-hour standby shifts, also scheduled in advance. Operators may or may not be required to physically appear at Chevron's facility to work standby shifts.

Plaintiffs allege that Chevron requires Operators to be available to receive a call from Chevron either 30 minutes or 1 hour prior to the start of each assigned standby shift, and either 30 minutes or 1 hour after the start of the shift, during which time Operators may be told that they must travel to Chevron's facility to work. Cf. Compl. ¶¶ 3, 23.[2] Plaintiffs allege that they must arrive at work within 2 hours of being contacted. Id. ¶¶ 3, 23.[3] If an Operator fails to answer a supervisor's telephone call during the designated time period, the Operator is considered absent without leave and subject to discipline. Id. ¶ 3. If the Operator is not contacted during the designated 1.5-hour time period, Chevron does not compensate the Operator. Id.

The 12-Hour Shift Agreement largely aligns with plaintiffs' relevant allegations about how standby shifts operate:

- For every 12-hour shift, there is also a "standby" crew "in the event short notice overtime (less than 12 hours notice) is required and no volunteers are available." 12-Hour Shift Agreement at p. I-5.

---

[1] Although the complaint does not allege their existence, plaintiffs' relationships with defendant are governed by the CBAs. Defendant attached the CBAs to its notice of removal, and plaintiffs do not contest their accuracy.

[2] The CBAs provide that Operators must be available during a window beginning 2 hours prior to the start of shift and ending 30 minutes after the start of the shift. Compare Compl. ¶¶ 3, 23 with 12-Hour Shift Agreement at p. III-7 ¶ 2.

[3] The CBAs provide that Operators must "be able to get to work in a reasonable time period after being contacted." Compare Compl. ¶¶ 3, 23 with 12-Hour Shift Agreement at p. III-7 ¶ 7.

3

- "Standby personnel must be available . . . during the period extending from 2 hours prior to shift change and 1/2 hour after shift change" and "will receive no standby pay allowance." Id.; see also id. at p. III-7 ¶ 2. As such, on-call Operators need to make themselves available to work their scheduled 12-hour on-call shifts, and must also be accessible to speak by telephone from 4 AM to 6:30 AM. Id. at pp. I-5, III-7 ¶ 3.
- "Standby personnel must give a number where they can be reached during standby periods." Id. at p. III-7 ¶ 4. Standby Operators must be available to be spoken with "directly." Id. ¶ 5. Answering machines and beepers are not sufficient. Id.
- Employees scheduled to work standby for a given shift who "are not personally contactable during the standby period will be considered AWOL and subject to disciplinary action. (Discipline will follow the established practice for absenteeism)." Id. ¶ 6.
- "Standby personnel must be able to get to work in a reasonable time period after being contacted." Id. ¶ 7.

## DISCUSSION

**A.  Legal Standard**

    **1.  Removal**

Removal jurisdiction is based entirely on federal statutory authority. See 28 U.S.C. §§ 1441–55. A defendant may remove "any civil action brought in a State court of which the district courts . . . have original jurisdiction[.]" 28 U.S.C. § 1441(a).

"To remove a case from a state court to a federal court, a defendant must file in the federal forum a notice of removal 'containing a short and plain statement of the grounds for removal.'" Dart Cherokee Basin Operating Co., LLC v. Owens, 135 S. Ct. 547, 551 (2014) (quoting 28 U.S.C. § 1446(a)). The "short and plain" statement "need not contain evidentiary submissions." Id.

Once confronted with a motion to remand, the defendant bears the burden of

4

establishing jurisdiction by a preponderance of the evidence. Id. at 553–54. On a motion to remand, both "parties may submit evidence outside the complaint, including affidavits or declarations, or other summary-judgment-type evidence[.]" Ibarra v. Manheim Investments, Inc., 775 F.3d 1193, 1197 (9th Cir. 2015) (internal quotation marks omitted); see also Kroske v. U.S. Bank Corp., 432 F.3d 976, 980 (9th Cir. 2005).

Although the Ninth Circuit has "not addressed the types of evidence defendants may rely upon to satisfy the preponderance of the evidence test for jurisdiction, [it has] endorsed the Fifth Circuit's practice of considering facts presented in the removal petition as well as any 'summary-judgement-type evidence[.]'" Matheson v. Progressive Specialty Ins. Co., 319 F.3d 1089, 1090 (9th Cir. 2003) (quoting Singer v. State Farm Mut. Auto. Ins. Co., 116 F.3d 373, 377 (9th Cir. 1997)); Valdez v. Allstate Ins. Co., 372 F.3d 1115, 1117 (9th Cir. 2004). Defendants cannot rely simply upon "conclusory allegations." Singer, 116 F.3d at 377. "As with other important areas of our law, evidence may be direct or circumstantial." Ibarra, 775 F.3d at 1199.

Plaintiff may submit rebuttal evidence. Id. "[T]he removing defendant, has the burden of proof on this. Under the preponderance of the evidence standard, if the evidence submitted by both sides is balanced, in equipoise, the scales tip against federal-court jurisdiction." Id. (citation omitted).

**2.      LMRA Preemption**

Under section 301 of the Labor Management Relations Act, 29 U.S.C § 185 (the "LMRA"), "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). "As a result of this broad federal mandate, the Supreme Court has explained, the 'preemptive force of section 301 is so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization.'" Burnside v. Kiewit Pac. Corp.,

5

491 F.3d 1053, 1059 (9th Cir. 2007) (quoting Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 23 (1983)).

"Once preempted, any claim purportedly based on a state law is considered, from its inception, a federal claim, and therefore arises under federal law. This is true even in some instances in which the plaintiffs have not alleged a breach of contract in their complaint, if the plaintiffs' claim is either grounded in the provisions of the labor contract or requires interpretation of it. Otherwise, parties would be able to evade the requirements of section 301 by relabeling their contract claims as claims for tortious breach of contract or some other state cause of action, and thus elevate form over substance." Id. (internal quotation marks and citations omitted).

"However, not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 or other provisions of the federal labor law. Claims bearing no relationship to a collective-bargaining agreement beyond the fact that they are asserted by an individual covered by such an agreement are simply not pre-empted by § 301." McCray v. Marriott Hotel Servs., Inc., 902 F.3d 1005, 1009 (9th Cir. 2018) (internal quotation marks and citations omitted). "The distinction between claims that are preempted and claims that are not doesn't lend itself to analytical precision." Id. at 1009–10 (internal quotation marks omitted).

The Ninth Circuit has explained a 2-part test to determine whether section 301 preempts a claim. First, the court inquires "into whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA. If the right exists solely as a result of the CBA, then the claim is preempted, and our analysis ends there." Burnside, 491 F.3d at 1059 (citing Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 212 (1985) (section 301 cannot "preempt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract"); Caterpillar Inc. v. Williams, 482 U.S. 386, 394 (1987) (section 301 only "governs claims founded directly on rights created by collective-bargaining agreements")). "To determine whether a particular right inheres in state law or, instead, is grounded in a CBA," the court considers "the legal

6

character of a claim, as 'independent' of rights under the collective-bargaining agreement [and] not whether a grievance arising from 'precisely the same set of facts' could be pursued." Id. at 1060 (quoting Livadas v. Bradshaw, 512 U.S. 107, 123 (1994)). "[R]eliance on the CBA as an aspect of a defense is not enough to inject a federal question into an action that asserts what is plainly a state-law claim." Id. (internal quotation marks omitted).

Second, if "the right exists independently of the CBA, we must still consider whether it is nevertheless 'substantially dependent on analysis of a collective-bargaining agreement.' If such dependence exists, then the claim is preempted by section 301; if not, then the claim can proceed under state law." Id. at 1059–60 (quoting Caterpillar, 482 U.S. at 394) (citations omitted). To determine whether a state law right is "substantially dependent" on the terms of a CBA, the court

> decide[s] whether the claim can be resolved by "looking to" versus interpreting the CBA. If the latter, the claim is preempted; if the former, it is not. Although the "look to"/"interpret" distinction is not always clear or amenable to a bright-line test, some assessments are easier to make than others. For example, we know that neither looking to the CBA merely to discern that none of its terms is reasonably in dispute, nor the simple need to refer to bargained-for wage rates in computing a penalty, is enough to warrant preemption. Similarly, alleging a hypothetical connection between the claim and the terms of the CBA is not enough to preempt the claim. Finally, in cases presenting the question whether the plaintiff's union bargained away the state law right at issue a court may look to the CBA to determine whether it contains a clear and unmistakable waiver of state law rights without triggering section 301 preemption.

Id. at 1060 (internal quotation marks and citations omitted); see also Livadas, 512 U.S. at 124 ("when the meaning of contract terms is not the subject of dispute, the bare fact that a [CBA] will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished").

"The line between reference to and interpretation of an agreement may be somewhat hazy. But the totality of the policies underlying § 301—promoting the arbitration of labor contract disputes, securing the uniform interpretation of labor

7

contracts, and protecting the states' authority to enact minimum labor standards—guides our understanding of what constitutes 'interpretation.' In the context of § 301 complete preemption, the term 'interpret' is defined narrowly—it means something more than 'consider,' 'refer to,' or 'apply.'" McCray, 902 F.3d at 1011 (internal quotation marks and citations omitted).

**B.     Analysis**

Defendant's sole basis for removal, and its sole argument in opposition to plaintiffs' motion to remand, is that plaintiffs' first claim under the California Labor Code is preempted by section 301 of the LMRA. This is also the basis for defendant's motion to dismiss.

As described above, the court applies a 2-part test to determine whether section 301 preempts plaintiffs' first cause of action. First, the court inquires "into whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA." Burnside, 491 F.3d at 1059. Second, if "the right exists independently of the CBA, we must still consider whether it is nevertheless 'substantially dependent on analysis of a collective-bargaining agreement.'" Id.

Regarding the first step, plaintiffs' primary cause of action is asserted under California state law for failure to pay reporting-time pay. Plainly, plaintiffs do not raise any claim under a CBA, or even reference one in their complaint. Defendant does not challenge this point, but instead argues the CBAs must be analyzed under the second Burnside step.

Regarding the second step, the parties dispute whether the CBAs must be analyzed to determine when an employee reports to work under Wage Order 1-2001.

The wage order underlying plaintiffs' first cause of action provides, in part:

> Each workday an employee is required to **report for work** and does report, but is not put to work or is furnished less than half said employee's usual or scheduled day's work, the employee shall be paid for half the usual or scheduled day's work, but in no event for less than two (2) hours nor more than four (4) hours, at the employee's regular rate of pay, which shall not be less than the minimum wage.

8

Wage Order 1-2001 (emphasis added).[4]

The California Court of Appeal recently addressed similar language in an analogous wage order, in the context of the mercantile industry. See Ward v. Tilly's, Inc., 31 Cal. App. 5th 1167, 1170 (2019), review denied (May 15, 2019) (addressing wage order No. 7-2001). That opinion is instructive. Like here, that court considered when an employee "report[s] for work" within the meaning of a wage order. Much like here, the plaintiff in that case contended "that when on-call employees contact Tilly's [the employer] two hours before on-call shifts, they are 'report[ing] for work' within the meaning of the wage order, and thus are owed reporting time pay. Tilly's disagrees, urging that employees 'report for work' only by physically appearing at the work site at the start of a scheduled shift, and thus that employees who call in and are told not to come to work are not owed reporting time pay." Id. at 1171.

The Ward case concerned "on-call" shifts that required employees "to contact their stores two hours before the start of their on-call shifts to determine whether they were needed to work those shifts." Id. "Employees were disciplined if they failed to contact their stores before on-call shifts, or if they contacted the stores late, or if they refused to work on-call shifts. . . . However, Tilly's did not include on-call shifts as part of the employee's 'scheduled day's work' when calculating pay unless the employee was required to work the on-call shift; and it did not consider an employee to have 'reported for work' if he or she called the store prior to an on-call shift, but was told he or she was not needed." Id. at 1172. The Ward court held that such on-call scheduling "triggers Wage Order 7's reporting time pay requirements." Id. at 1171.

The Ward court concluded that "telephonic call-in requirements" can "trigger reporting time pay." Id. at 1182. Accordingly, "an employee need not necessarily physically appear at the workplace to 'report for work.' Instead, 'report[ing] for work'

---

[4] "[W]age orders are issued pursuant to an express delegation of legislative power, and they have the force of law." Alvarado v. Dart Container Corp. of California, 4 Cal. 5th 542, 552 (2018).

9

within the meaning of the wage order is best understood as presenting oneself *as ordered.* 'Report for work,' in other words, does not have a single meaning, but instead is defined by the party who directs the manner in which the employee is to present himself or herself for work—that is, by the employer. As thus interpreted, the reporting time pay requirement operates as follows. If an employer directs employees to present themselves for work by physically appearing at the workplace at the shift's start, then the reporting time requirement is triggered by the employee's appearance at the job site. But if the employer directs employees to present themselves for work by logging on to a computer remotely, or by appearing at a client's job site, or by setting out on a trucking route, then the employee 'reports for work' by doing those things. And if, as plaintiff alleges in this case, the employer directs employees to present themselves for work by telephoning the store two hours prior to the start of a shift, then the reporting time requirement is triggered by the telephonic contact." Id. at 1185.

The Ward court thoroughly assessed of the proper construction of "report to work" as used in the relevant wage order, and arrived at the holding described above. This court finds that analysis relevant and persuasive with respect to Wage Order 1-2001. See Muniz v. United Parcel Serv., Inc., 738 F.3d 214, 219 (9th Cir. 2013) ("We generally will 'follow a published intermediate state court decision regarding California law unless we are convinced that the California Supreme Court would reject it.'").

The definition elucidated by the Ward court turns on the employer's factual practices of how it directs employees to report for work. Contrary to defendant's view, Wage Order 1-2001 does not simply defer to whatever formal definition of "report to work" the employer might choose to document. Instead, the inquiry turns on how employees actually report for work. That is to say, the legal definition of "report to work" is established by the wage order, but the physical acts an employee must undertake to satisfy that definition can differ by employer. For example, in Ward, the employer's actual practices required employees to phone into work two hours before their on-call shift began to learn whether they would need to physically appear at the store and work the

10

on-call shift. As the court explained, the act of an employee calling in to learn whether he would be required to work an on-call shift constituted reporting for work under the wage order's definition of "report to work" (regardless of whatever formalistic definition of "report for work" the employer might prefer). Here, defendant's primary argument—that an employer may define the phrase "report for work" as used in Wage Order 1-2001 however it chooses—is based on a fundamental misunderstanding of Ward.[5]

However, defendant is right to the extent that Wage Order 1-2001's definition of "report for work" hinges on how an employer actually requires employees to present themselves for work. So, the court looks to plaintiffs' allegations and the CBAs to assess whether the CBAs must be analyzed or interpreted to determine how Chevron requires employees to present themselves for work.

The CBAs explain that Operators may volunteer for overtime on their days off "as long as the overtime does not interfere with their standby requirement." 12-Hour Shift Agreement at p. I-4. Plainly, Operators are expected to reserve the hours of their scheduled, on-call shifts for the potential to work on-call, and they cannot make other plans (like volunteering for other shifts) during times they are scheduled to be on-call. The 12-Hour Shift Agreement further explains that for every 12-hour shift, there will be a "standby" crew "in the event short notice overtime (less than 12 hours notice) is required[.]" Id. at p. I-5. "Standby personnel must be available . . . during the period extending from 2 hours prior to shift change and 1/2 hour after shift change" and "will receive no standby pay allowance." Id.; see also id. at p. III-7 ¶¶ 2–3; cf. Compl. ¶¶ 3 ("Chevron requires operators at its Richmond factory to be at the ready to receive calls . . . when assigned to cover standby shifts . . . commenc[ing] 1 hour prior to the start of the scheduled standby shift and end[ing] 30 minutes after the standby shift has started"), 23 ("Plaintiffs and other operators had to be at the ready to receive a call for the period 30 minutes prior to the start of a standby shift until one hour after the standby shift

---

[5] The CBAs' definition of that phrase may be relevant to a cause of action alleging breach of contract based on the CBAs, but not to a cause of action under Wage Order 1-2001.

11

commenced."). The shift changes are at 6 AM and 6 PM, meaning that Chevron requires on-call Operators to be available to speak by telephone from approximately 4 AM to 6:30 AM. See 12-Hour Shift Agreement at pp. I-3 (shift change at 6 AM and 6 PM), I-5 (2.5-hour standby period, from 4 AM to 6:30 AM), III-7 (same).[6] "Standby personnel must give a number where they can be reached during standby periods." Id. at p. III-7 ¶ 4. They must be available to be spoken to "directly"—answering machines and beepers are not sufficient. Id. ¶ 5. Employees scheduled for a given standby shift who "are not personally contactable during the standby period will be considered AWOL and subject to disciplinary action. (Discipline will follow the established practice for absenteeism)." Id. ¶ 6; Compl. ¶ 3.

The CBAs and allegations make clear that Operators must be ready to personally answer a phone call for a 1.5- or 2-hour period surrounding the start of every scheduled, on-call shift or face punishment. The mere inability of a supervisor to talk to an Operator "directly" during that 2.5-hour window renders the employee "AWOL and subject to disciplinary action." 12-Hour Shift Agreement at p. III-7 ¶¶ 5–6.

There is no language in the CBAs that must be "analyzed" to reach these understandings. Although the court is not tasked with determining whether plaintiffs' allegations state a meritorious claim under Wage Order 1-2001 upon consideration of plaintiffs' motion to remand, the facts above make up plaintiffs' essential allegations under the precedent set out in Ward, and they are all plain from a mere "look" to the CBAs. The primary distinction between plaintiffs' complaint and the policy discussed in Ward is that here, the employees must be ready to receive a call from their employer during a set window of time, whereas in Ward the employees were required to initiate the call.

Defendant argues that the CBAs must be interpreted—rather than merely looked to—for four primary reasons.

---

[6] Under the facts alleged in the complaint, the standby reporting period would be slightly different.

12

First, defendant argues that this court would have to resolve ambiguities of what it means to be "contacted" versus "personally contactable" during the window of time that Operators must be available to answer a call from Chevron. The court disagrees. The CBA provisions containing these terms are entirely clear and do not require analysis for purposes of preemption. The CBAs provide that standby personnel must be "available" during a 2.5-hour window, they must give a number "where they can be reached," and they are "contacted" only when a supervisor has "been able to talk with them directly. Answering machines or beepers are not an acceptable alternative to direct contact between supervisors and employees." 12-Hour Shift Agreement at p. III-7 ¶¶ 2–5. The next paragraph explains that standby employees who "are not personally contactable during the standby period will be considered AWOL and subject to disciplinary action." Id. ¶ 6. The CBAs could hardly be more clear on this point. If a supervisor calls an employee at the phone number the employee designated and does not "talk with [him] directly," the employee is subject to discipline. The employee must be available to speak on the phone and cannot rely on answering machines or beepers. A mere look is sufficient to understand and apply this requirement.

Second, defendant argues that the requirement that Operators "be able to get to work in a reasonable time period after being contacted" is ambiguous and requires interpretation. Id. ¶ 7. Although it is true that the use of the word "reasonable" makes that phrase inherently subject to interpretation, it does not need to be interpreted to resolve plaintiffs' claim. Wage Order 1-2001 concerns employees who are required to report to work, do report, and are not put to work. Plaintiffs' claim, relying on Ward, is that they were required to report to work and actually reported to work by being available and personally contactable during specified on-call periods, and after so reporting they were not put to work. The merits of that claim do not depend on how much time might have passed between the employee reporting for work and his physical arrival at the workplace. Plaintiffs' claim is that the Operators report to work by being reachable at fixed times, which California law can evaluate without any dependence on the

13

requirement that standby Operators "be able to get to work in a reasonable time period after being contacted." A CBA does not preempt claims under California's labor laws simply because it contains ambiguous terms. Something more is required—resolution of the state-law claim must depend upon an analysis of such a term.

Third, defendant argues that when an Operator is called for a standby shift, he can answer the phone and lie to his employer in various ways, for example by falsely claiming to be sick, to avoid the shift. Defendant argues that historical practice shows that Chevron considers intentional lying by its employees permissible, and their doing so does not result in discipline. Therefore, defendant argues that Operators are not actually punished for failing to work on-call shifts. This argument fails for at least two reasons.

For one, this argument does not identify any language in the CBAs that must be analyzed or interpreted. The plain language of the CBAs on this point is clear from a simple look. It explains that employees who do not answer their telephone while on-call "will be considered AWOL and are subject to disciplinary action. (Discipline will follow the established practice for absenteeism)." 12-Hour Shift Agreement at p. III-7 ¶ 6. Defendant's argument appears to amount to a factual dispute—that Chevron's policy conflicts with its practice—about whether standby employees are ever really required to work standby shifts, because they are not punished for failing to do so. But that is a factual question about how Chevron enforces its policies, not an argument that the CBAs must be analyzed or interpreted. Again, the CBAs could hardly be more clear on this point, regardless of whether Chevron declines to enforce their provisions in particular circumstances.

Moreover, the CBAs make clear that not answering a supervisor's phone call makes one subject to disciplinary action—even if Chevron is indifferent as to whether employees lie after answering the call. Plaintiffs' argument is that they report to work by being available to answer the call, not by physically appearing at Chevron's facility. Defendant's argument that plaintiffs can evade work by lying <u>after answering the call</u>

1 misses the point, and is irrelevant to plaintiffs' claim.[7]

2 Fourth, defendant points to numerous other uses of the phrase "report for work" in
3 the CBAs. This is apparently an effort to argue that "report to work" under California law
4 must take on the definition used in Chevron's contracts, which defendant argues means
5 physical arrival at Chevron's workplace. But the meaning of the term in the parties'
6 contractual agreements is not relevant to plaintiffs' claim. As addressed above, contrary
7 to defendant's view, Wage Order 1-2001's definition of "report to work" does not depend
8 upon whatever formal definition of the term Chevron chooses to include in its private
9 contractual agreements. It is possible for the CBAs and California law to define the same
10 phrase differently, and defendant does not argue that the CBAs have displaced California
11 law or reduced its protections. See Opp. at 15. Of course, the CBAs can provide their
12 own protections independent of California law using their own definitions of terms. But
13 for the reasons stated above, the court need not harmonize the phrase's meaning
14 between California law and the CBAs. Nor need the court harmonize the phrase within
15 the CBAs themselves, if a state court can resolve how employees report to work under
16 Wage Order 1-2001 without analyzing the CBAs at all.

**CONCLUSION**

18 For the foregoing reasons, the court finds that plaintiffs' first cause of action is not
19 preempted by the LMRA. As defendant's removal was based solely on the argument that
20 plaintiffs' first cause of action was preempted by the LMRA, plaintiffs' motion to remand is
21 GRANTED. As such, the court does not reach defendant's motion to dismiss, which is
22 TERMINATED by this order. This action is hereby REMANDED to the Superior Court of
23 / / /
24 / / /

---

[7] Defendant separately argues that Operators can be removed from the list of standby employees for a given shift prior to being called. That is true enough, and plaintiffs are unlikely to prevail under Wage Order 1-2001 for on-call shifts they are not scheduled to work, and for which they are not required to report to work. But that does not address the scheduled, on-call shifts upon which plaintiffs' complaint is actually based.

15

California, County of Contra Costa.

**IT IS SO ORDERED.**

Dated: December 5, 2019

                                              /s/ Phyllis J. Hamilton  
                                              PHYLLIS J. HAMILTON  
                                              United States District Judge